## KENTUCKY UTILITIES CO. v. YOUNG et al.

Court of Appeals of Kentucky.

Feb. 22, 1952.

As Modified on Denial of Rehearing May 9, 1952.

T. M. Galphin, Jr. and Ogden, Galphin & Abell, all of Louisville, Otto C. Martin, Hartford, for appellant.

Clarence Judah, Louis Garlove, Louisville, Clarence Bartlett, Walter L. Catinna, Hartford, for appellees.

MILLIKEN, Justice.

Upon the ground that it was entitled to a directed verdict, the appellant, Kentucky Utilities Company, hereinafter referred to as the Company, has asked for the reversal of a judgment for $8,000 rendered against it in favor of the appellee, C. T. Young, doing business as Young Hardware Company in Beaver Dam, Kentucky.

The appellee's frame millwork building was partially destroyed by fire during the early morning hours of July 18, 1947, and his pleadings in this litigation specifically assert that the fire loss was caused by the Company's defective equipment—an electric meter and its appurtenances—which had been installed by it in the appellee's plant. On the day before the fire the Company's meter reader discovered that the meter had not registered current since June 19, 1947. The meter was located inside the appellee's building where it was affixed to oak boards three-fourths of an inch thick, which ran crosswise to the studding and were seven or eight feet from the floor. According to the appellee, the Company's switch and fuse box were located inside the building four or five inches below the meter, but there is conflict in the testimony as to whether the Company's power lines first entered the switch box and from there went to the meter as asserted by the Company, or whether it was the other way around as claimed by the appellee.

It was the custom in the appellee's plant to remove sawdust and shavings from its building before quitting time and to burn them in an incinerator, variously estimated to be ten to thirty feet from his building. This highly combustible refuse was sucked from the millwork building through a large galvanized pipe directly into the incinerator. This galvanized pipe was about four feet from the meter and about the same height from the floor. When the weather

was dry, as it was on this occasion, the earth around the incinerator and near the galvanized pipe was soaked with water as an added precaution against fire hazards.

On the evening of the fire Mr. Young left his plant at about ten o'clock after having pulled the master switch so that no electric current passed through the lines to the electrically-operated woodworking machinery. Three or four hours later he was notified the plant was on fire. He testified he found a circular hole, about two feet in diameter, burned through the wall of the building with the white hot electric meter protruding through it. Later testimony offered in his behalf declared the meter could not have been so badly damaged except by terrific heat generated internally and of electrical origin. The meter was not introduced in evidence, for it had been removed eighteen days after the fire and junked as not worth repairing. At the time it was destroyed no claim or intimation had been made that the fire was caused by the defective meter.

While the appellee's plant had been operated normally during the period of nearly a month when the meter was not registering, nevertheless appellee's expert witness opined that a short circuit in the meter could heat it to great intensity in a matter of minutes. The meter was irreparably damaged, yet the switch box a few inches below it was not badly damaged. It was appellee's contention that the heat generated by the burning sidewall of the building was not sufficient to damage the meter so irreparably. Other witnesses were presented, many of whom were members of the Beaver Dam Fire Department, who largely confirmed appellee's testimony that the hole was burned in the wall at the site where the Company's wires entered the wall of the building to connect with the meter, that the burned meter protruded through the hole, and that the wires were cut and guarded to prevent fire fighters and others from coming in contact with them. There also was testimony that there was no fire on the ground around the incinerator when the Fire Department arrived.

To counter the evidence offered by the appellee, the Company pointed to the fact that there was no load on the line at the time the fire occurred, that the fuse at the transformer about a hundred feet away did not blow, that the wires from the transformer to the building were not damaged, that the woodworking plant was in normal operation throughout the preceding month when the meter was not registering the current consumed, and that the lights operated as late as 10 p. m. the night of the fire. The mechanism of the meter was described and its standard usage established. It was conceded by an expert witness of the Company that electric motors have been known to burn up without blowing the fuses or damaging the transformers with which they were connected. The failure of the meter to register apparently was caused by some foreign interference with the functioning of the magnetic coil of low voltage which controlled the registering disc; the ordinary current supply coil in the meter functioned sufficiently well, at least until the night of the fire, to supply the plant with normal current.

The Company ably argues that the appellee has failed to establish by substantial evidence that the failure of the meter to register the current was the cause of the fire, and that any judgment based on his evidence is founded on conjecture. The appellee's pleadings were sufficiently broad in purport to permit a judgment for him on the evidence adduced, assuming, of course, that we consider his evidence substantial enough to support the inference that the defective meter caused the fire.

Whether the appellee's evidence is substantial enough to support such an inference must be judged in the light of the duty owed him by the Company. On account of the deadly and latently dangerous character of electricity, suppliers of it owe a high duty of care to their customers, but they are not insurers. 29 C.J.S., Electricity, § 39, page 575. The defective operation of the recording device in the meter was not considered a defect of sufficient consequence as to cause the Company to remove the meter immediately. An expert for the Company admitted that a short circuit in the current coil of the meter (not the registration coil) would have a tendency to build up heat. In the light of this possibility, we have the consensus of the witnesses

that the focus of the fire was at the site of the meter from which it worked outwardly and upward toward the roof. ..

In view of the fact that the lines of appellee's plant could carry current of sufficient power to operate his woodworking machinery and, according to appellee's version, were connected directly to the defective meter, the Company probably should have exercised more vigilance in removing the meter than would be justified in the instance of ordinary domestic usage—the higher the power, the greater the risk. In view of the testimony heretofore summarized, it was within the province of the jury to determine whether the Company's conduct in this instance amounted to negligence. Restatement of the Law of Torts, Section 285. Whether their determination in this respect bears a reasonable relation to the evidence offered is the essence of our problem, and the determinant of whether we reverse the judgment.

It is our conclusion that the jury did not act unreasonably in its holding, for there was substantial evidence to show the fire was focused around a meter which the Company knew was defective, but which defect it apparently failed to appreciate. In the circumstances, we believe that we would be invading the province of the jury were we to grant the relief prayed. Kentucky & West Virginia Power Co. v. Elliott, 310 Ky. 496, 220 S.W.2d 964; Kentucky & West Virginia Power Co. v. Kilburn, 304 Ky. 635, 201 S.W.2d 896; Kentucky Utilities Co. v. White Star Coal Co., 244 Ky. 759, 52 S.W.2d 705.

The judgment is affirmed.